OPINION
{¶ 1} In this action, Vernon Donnelly, Sr. (Vernon) appeals from a judgment and decree of divorce. Vernon and his wife, Carole, were married for more than thirty years before their divorce was granted in May, 2002. Vernon has filed ten assignments of error, which we will separately address. For now, we simply indicate that the assignments of error are generally without merit, except for the fourth assignment of error. Consequently, the trial court judgment will be affirmed in part and reversed in part, and the case will be remanded for the limited purpose of re-evaluating lots jointly owned by the parties and ascertaining the precise number of lots purchased.
 I {¶ 2} In the first assignment of error, Vernon alleges that the trial court erred in penalizing him for financial misconduct. Vernon has not specified how the trial court penalized him, other than by assuming an "antagonistic stance." After examining the record and decision, we do not that find the trial court's attitude was antagonistic.
 {¶ 3} Under R.C. 3105.171(E)(3), if a spouse engages in financial misconduct, "including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." According to R.C. 3105.171(A)(1), a distributive award is "any payment or payments, in real or personal property, that are payable in a lump sum or over time, in fixed amounts, that are made from separate property or income, and that are not made from marital property and do not constitute payments of spousal support * * *."
 {¶ 4} Decisions compensating offended spouses are reviewed for abuse of discretion. Thill v. Thill, Clark App. No. 2001-CA-23,2001-Ohio-1490, 2001 WL 929995, *2. Abuse of discretion implies that the court's attitude is "unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. It can also mean that the court's decision is not supported by a sound reasoning process.AAAA Enterprises, Inc. v. River Place Community Urban RedevelopmentCorp. (1990), 50 Ohio St.3d 157, 161.
 {¶ 5} The evidence in the present case indicates that Vernon did commit financial misconduct. According to both parties, their assets were always held in joint bank accounts during most of their marriage. In November, 1996, Carole deposited inheritances she received from her mother and father in the parties' joint bank account. The inheritances were about $65,588 and $27,300, respectively. After this deposit, the joint account contained approximately $262,000. About a month later, Vernon opened a second account at the same bank, in his name only, and deposited $100,000 from the joint account into his separate account. The transfer of funds was based on advice from the bank that only amounts under $100,000 would be federally insured. The first account remained joint, and Vernon and Carole both continued to access the original account, even after they separated in August, 1998. However, Carole never had access to any of the funds in the second account.
 {¶ 6} In June, 1998, about $11,000 was withdrawn from the account that was solely in Vernon's name. Carole was not told what happened to the money. Another $75,000 was withdrawn from the same account in January, 1999. At that time, Vernon deposited $75,000 in an American Funds account in both his and Carole's names. Carole signed the application for the American Funds account on January 21, 1999. Subsequently, when Carole filed for divorce, she asked the court for a temporary restraining order prohibiting Vernon from disposing of any real or personal property and from transferring or withdrawing any funds in any bank account or pension fund. The temporary restraining order was granted on June 22, 1999. However, by June 30, 1999, the funds in the American Funds account had all been withdrawn, except for a few hundred dollars. According to Carole, Vernon removed her name from the American Funds account by using a power of attorney that she had previously given him. She did not consent to this transaction.
 {¶ 7} Documents submitted to the trial court reveal that the $75,000 was withdrawn from the American Funds account on June 29 and 30, 1999, i.e. shortly after the temporary restraining order was granted. Vernon testified that he transferred the funds to accounts in First Tennessee Bank, which later became Union Planters Bank. In November, 2000, the two accounts in Union Planters Bank (which were also in the names of Vernon and Carole), showed a total combined balance of about $54,346. However, Carole did not access these accounts or withdraw any funds from these accounts during the divorce proceedings.
 {¶ 8} Vernon testified that he used the money in the American Funds account to pay bills on property the parties owned in Tennessee ($2,000 per month for 27 months, or $54,000). However, the property in Tennessee for which Vernon made these payments was his residence during most of the divorce proceedings.
 {¶ 9} During the marriage, in 1994, Vernon and Carole purchased a half-interest in a marina in Tennessee called Sugar Halibut Dock. In May, 1997, they also purchased lots near the marina for $150,000, from Emmett Whitaker. Seven of these lots were then sold by land contract to a Denny Recore in August, 1998, for $100,000. Carole signed the land contract, agreeing to the sale, but she had not received any money for the lots by the time of the final divorce hearings (in November, 2001, and January, 2002). Moreover, on June 18, 1999, shortly before the divorce was filed, Vernon used the power of attorney to execute a quit-claim deed of Carole's interest in ten lots. This resulted in Vernon being the sole owner of the lots. The only lot not transferred was one that had been previously sold to another party for $30,000 to $35,000. Although this act did not violate the restraining order because it occurred before the divorce was filed, Vernon did admit he had violated the restraining order during the divorce proceedings by selling various items of personal property. The property in question included about $13,000 in trailers, boats, and water-skiing equipment. Vernon deposited the proceeds of these sales into the Union Planters Bank accounts. He also collected rent from the top half of his Tennessee residence (which had been made into vacation rental property), and did not account to Carole for the rent.
 {¶ 10} Vernon's Tennessee residence was located next to Sugar Halibut Dock. While the divorce was pending, Vernon and Carole sold their interest in the marina, plus the residence, to their partners in the marina. The purchase price was $400,000 cash and the assumption by the partners of a first mortgage on the house. Carole realized $200,000 from this sale ($100,000 cash in hand with the rest to be paid later). Vernon received about $105,000, due to a deduction for a $95,000 second mortgage he had placed on the house.
 {¶ 11} Vernon's testimony about the $95,000 second mortgage was not particularly credible. As we mentioned before, seven lots were sold to an individual named Danny Recore. Vernon testified that he loaned $50,000 of the $95,000 mortgage proceeds to Recore so that Recore could build a $200,000 home on one of the lots. Allegedly, at some point, Recore was going to pay Vernon for the seven lots he had purchased, as well as the $50,000 loan. However, by the time of the divorce hearings, Recore had paid only the interest on the land contract for the seven lots, and nothing on the $95,000 mortgage. Vernon also did not submit documentation regarding the interest payments, nor did he have any documentation about the $50,000 loan he made to Recore. Again, Carole did not receive any of the proceeds from the sale of the lots and title was transferred to Vernon without her consent.
 {¶ 12} After reviewing the above financial matters, the trial court found that Vernon had committed financial misconduct. We agree with the trial court. The odd nature and lack of documentation of Vernon's financial dealings raises the inference that assets were being concealed. Furthermore, due to the outright transfer of property and assets without Carole's knowledge or approval, there is no doubt that financial misconduct occurred. Under the circumstances, the court could have imposed a distributive award, but chose not to do so. In fact, the court commented that:
 {¶ 13} "[w]hile the Defendant [Vernon] was clearly in the wrong, it is not to either party's advantage to further penalize him. The Plaintiff stressed throughout the proceedings that she wanted to keep what she had worked for and saved. She expressed no interest in pursuing retribution. In the interest of an equitable distribution, each party will keep the funds in his or her possession, free and clear of any claim by the other."
 {¶ 14} Because the trial court did not impose a penalty for financial misconduct, the first assignment of error is without merit. We also see no indication of an antagonistic attitude, since the court could have imposed a penalty, but chose not to do so.
 {¶ 15} Accordingly, based on the preceding discussion, the first assignment of error is overruled.
 II {¶ 16} In the second assignment of error, Vernon contends that the trial court erred in finding that most of Vernon's testimony was "deliberately vague and evasive." According to Vernon, the court should have instead found that Carole's testimony was evasive. As proof of evasiveness, Vernon points to Carole's lack of recall about whether: 1) she had IRA accounts; 2) purchased stock during the marriage; and 3) paid fees for an attorney who had originally represented both Carole and Vernon in connection with the sale of the marina (Sugar Halibut Dock). Vernon additionally says that Carole was belligerent because she refused to reveal the location of her share of proceeds from the sale of Sugar Halibut Dock.
 {¶ 17} After reviewing the record in detail, we find that the above examples are taken out of context. Further, we did not find Carole's testimony evasive.
 {¶ 18} The record indicates that Vernon handled the bulk of the couple's business affairs during their marriage. Vernon retired from the Air Force in 1978, and the parties thereafter operated some businesses, including the Tennessee marina, and a dry cleaner/coin-operated laundry. Carole worked at Ameritech (formerly Ohio Bell) from 1959 until her retirement in 1992. She also worked in the couple's laundry business and helped out at the marina. Vernon handled maintenance for the businesses and was more heavily involved in the financial affairs. Under these circumstances, Carole might reasonably be somewhat unfamiliar with financial matters.
 {¶ 19} Moreover, Carole did disclose information about her assets and accounts. When Carole retired, she took a lump-sum pension amount of $141,000 and invested it in different funds through an investment advisor (Chuck Spurgeon). She also had $40,684.29 from an Ameritech Savings Plan. By the time of the divorce hearings, Carole had only one account left with Spurgeon, and had invested the rest of her funds with Fifth Third Bank. Exhibits were introduced at trial that revealed Carole's accounts and account numbers, as well as the source of the funds in the accounts. Two accounts were labeled "IRAs," and consisted of the original Ameritech funds that had been rolled over. The total of the two "IRAs" was $234,037, as of August 15, 2001. The amount of the funds had fluctuated somewhat, due to changes in the stock market. Consequently, while Carole may not have been familiar with a few specific financial details, such as whether she had purchased stock during marriage, she did give an adequate amount of information about her accounts.
 {¶ 20} Furthermore, we do not find that Carole was belligerent. In the excerpt Vernon quotes, Carole was confronted with testimony from her deposition, in which she had said that she was unsure of the location of the remaining $100,000 due on the marina sale. She was apparently asked in August, 2001, to find out where the money was. However, she had made no apparent effort to do so by the time of the November 20, 2001 hearing. When asked about this by Vernon's attorney, Carole said she had been told that she had a note for the money that was owed, and the note was not in her possession. She further testified that she and Vernon had each received their share of the marina property, and that the location of the money was not anyone's business. The location of funds might be relevant in some circumstances, but it was not pertinent to the present case. Both parties were represented by counsel in Tennessee, as well as in Ohio. They agreed to sell jointly owned property during pending divorce proceedings. They also agreed on allocation of the sale profit. The trial court in Ohio subsequently adopted their resolution of the matter. Therefore, the court did not need to know where the sale proceeds were located.
 {¶ 21} However, even if the court had ordered a different division of the property, it would not have needed to know where the funds were located. If the court felt Vernon was entitled to a larger share of the funds, it could have simply ordered Carole to remit the necessary funds. Her failure to do so could then have been the subject of a contempt proceeding.
 {¶ 22} As a further matter, during the first divorce hearing, Carole did testify on redirect examination that she had received $100,000 from the purchasers of the marina property. The purchasers also gave her a promissory note for the other $100,000, agreeing to pay that amount at a later time. At the second divorce hearing, Carole produced the promissory note, and indicated that she could collect the money then, or at specified intervals. Thus, Carole did reveal adequate information about the location of the asset. As we said, however, the location was irrelevant.
 {¶ 23} In the final analysis, the trial court clearly chose to believe Carole and to disbelieve many things Vernon said. We have often stressed that trial courts are "in a better position than we are to assess the credibility and demeanor of witnesses." Jackson v. Jackson
(2000), 137 Ohio App.3d 782, 797. However, even if this were not the case, the trial transcript contains numerous instances where Vernon's testimony appears evasive and contradictory. Accordingly, the trial court did not abuse its discretion when it found that much of Vernon's testimony was deliberately vague and evasive.
 {¶ 24} Based on the preceding discussion, the second assignment of error is overruled.
 II {¶ 25} In the third assignment of error, Vernon claims that the trial court erred in failing to credit him with paying joint business expenses. The expenses in question were upkeep on the Tennessee residence, a $95,000 home equity loan that Vernon paid to facilitate the marina sale, and a "second mortgage" of $95,000 that Vernon contends is separate from the home equity loan.
 {¶ 26} As we mentioned before, the Donnellys owned a half interest in Sugar Halibut Dock, which consisted of four and a half acres of ground, slips for 200 boats, and 1,500 feet of waterfront, all improved. They also owned a house on 3.02 acres adjacent to the marina. The house was not part of the marina, and was the Donnellys' residence when they were in Tennessee. As we also noted, the house and the Donellys' interest in the marina were purchased by their partners in the marina, in November, 2000, for $400,000 and assumption by the partners of the first mortgage on the house.
 {¶ 27} After Vernon and Carole separated, Vernon lived in the Tennessee house until he moved back to Ohio, in November, 2000 (about the same time the marina property and house were sold). When the Donnellys originally purchased the house, the mortgage was $155,000. As we said earlier, Vernon subsequently took out a $95,000 second mortgage, or home equity loan, on the house, using the power of attorney that Carole had given him. This amount was deducted from his share of the proceeds from the marina sale.
 {¶ 28} Contrary to Vernon's claims in his brief, the evidence did not indicate that both a second mortgage and a home equity loan, each equaling $95,000, existed. However, if any confusion on this point exists, it results from Vernon's own testimony. For example, at one point, Vernon referred to the loan as a "second home equity loan," which might lead one to believe that a prior home equity loan existed. No documentation to that effect was presented, however. In fact, no loans or mortgages are actually established by documentation in the record.
 {¶ 29} Vernon also did not directly say at any point that two home equity loans actually existed. Instead, his testimony (with the exception of the above remark) refers to only one $95,000 loan. Consequently, the trial court did not abuse its discretion by failing to consider the debt for "two" $95,000 home equity loans.
 {¶ 30} The court additionally did not abuse its discretion by failing to hold Carole responsible for some part of the $95,000 home equity loan. As we mentioned above, Vernon said he had loaned Denny Recore $50,000 from these proceeds, so that Recore could build a home on one of the lots Recore had purchased. Vernon also said that he used $40,000 to $45,000 of this money for his own upkeep and anything he needed in Tennessee. However, the home Recore built was on a lot that was still titled in Vernon's name. And, as we said earlier, Recore had not made any payments on the $50,000 loan. Again, this evidence raises an inference that these transactions were not at arms-length and were intended to conceal assets. After hearing the evidence, the trial court found that the second mortgage was used for Vernon's sole benefit. We agree with this conclusion.
 {¶ 31} The other expenses mentioned in this assignment of error are the $54,000 in expenses Vernon paid on the jointly owned property in Tennessee. The court did not award any specific compensation for these expenses. Vernon argues that this was inequitable, but we disagree.
 {¶ 32} As a preliminary point, we note that no temporary orders for spousal support were awarded, although such orders are permitted by R.C. 3105.18(B). When the divorce and counterclaim were filed, both parties listed their assets and debts as well as their monthly living expenses. Vernon's affidavit of income and expenses included about $1,785 in monthly housing expenses, including a home mortgage payment of $1,610 and gas and electric of $150. Both parties listed similar monthly total expenses, i.e., Vernon's total, including housing, was $2,581.95, while Carole's monthly total, including housing, was $2,381.46. Their monthly income and liquid assets, including savings accounts, were also similar. Under the circumstances, we think it was appropriate for both parties to pay their own living expenses during the pendency of the divorce proceedings.
 {¶ 33} Vernon claims the $54,000 was for business expenses, but the house in which he lived in Tennessee was not business property; it was his residence. Although the house was ultimately sold together with the marina property, that does not mean the house was part of a business when Vernon lived there. Moreover, to the extent any part of the house was used for "business," it was the top half, which was rented as a vacation property. The rental proceeds (at least $10,000, if one believes Vernon) was deposited in Vernon's bank account in Tennessee and no part of the rental money was given to Carole. Again, Vernon did not submit any documentation to prove or disprove any expenses or income, or to establish that any of the money he spent was for business, rather than personal, expenses. Accordingly, since no proof was submitted, the trial court had no reason to credit Vernon with paying business expenses.
 {¶ 34} Based on the preceding discussion, the third assignment of error is overruled.
 IV {¶ 35} In the fourth assignment of error, Vernon claims that the trial court erred in overstating the value of lots that the parties jointly owned. As we mentioned earlier, the parties purchased a number of lots in 1997. The precise number of lots is unclear, since the deed says 13 lots were purchased. Vernon testified, however, that the deed was incorrect and that only 11 lots were purchased. In any event, seven lots were sold to Denny Recore on a land contract in 1998 for $100,000, and one lot was sold to another party for $30,000 to $33,000. As we noted earlier, Vernon obtained sole title to the remaining ten lots (assuming only 11 lots were originally purchased) by quit-claim deed, by using the power of attorney, without Carole's consent.
 {¶ 36} In dividing the marital property, the trial court awarded Vernon the three remaining lots, and valued them at $35,000 each, for a total of $105,000. Based on the original purchase price and amounts paid on the lot, the court found that the marital equity in the lots was $75,000. Carole was awarded half this amount, and it was offset against Vernon's interest in Carole's retirement. The court also ordered Vernon to hold Carole harmless on any obligation for the lots.
 {¶ 37} Vernon says the amount the court selected was arbitrary, for several reasons. First, the average price of the lots sold to Recore was less than $14,286. Second, the three remaining lots were unimproved and were located on a mountainside. And finally, the parties had agreed at some point that their son was to be given one lot.
 {¶ 38} Under R.C. 3105.171(C)(1), the court is to divide marital property equally, unless an equal division is inequitable. Trial courts have broad discretion in deciding appropriate property awards, and we reverse only if the trial court abuses its discretion. Jackson v.Jackson (2000), 137 Ohio App.3d 782, 802.
 {¶ 39} As an initial matter, we disagree that the lots should have been valued at the average price of the lots sold to Recore. As we indicated, the sale to Recore does not appear to be an arms-length transaction. Further, we do not agree that the remaining three lots were of lesser value because they were unimproved mountainside lots. To the contrary, Vernon testified that all 11 lots were "[d]irectly behind the marina, up on the mountainside." Since all the lots were on a mountainside, the trial court had no reason to distinguish between the three remaining lots and any other lot. Thus, as one lot sold in what appears to be an arms-length transaction for $30,000 to $33,000, the trial court could have properly have used a value in that range for the remaining lots.
 {¶ 40} Unfortunately, the trial court's estimate was off by at least $2,000 per lot. Carole agrees that the trial court used a value that is not supported by the record. However, she contends that we should simply modify the property division to account for this amount.
 {¶ 41} If the trial court makes a mistake of fact in valuing marital property, the case should be remanded for correction of the error. Young v. Young, 146 Ohio App.3d 34, 37, 2001-Ohio-3354. As we said, we think the trial court meant to use $33,000 as the value of the lots. We also think that value can be justified by the evidence. Nonetheless, our role is not to decide valuation; the case must be remanded so the trial court can decide the value of the lots. Id. Accordingly, we will allow a limited remand for this purpose.
 {¶ 42} In this regard, we acknowledge that both parties did say that one lot was to be given to their son. However, no formal agreement or transfer of property existed, and the son was not made a party to the proceedings. In the absence of other parties as third party defendants, the trial court's only obligation was to divide the assets equitably between the parties. Compare Alimonos v. Alimonos, (Aug. 23, 1996), Montgomery App. No. 15294, 1996 WL 535289, *1 (in-laws were added as third-party defendants as they claimed an interest in the home where the parties to the divorce lived); Fisher v. Fisher (Aug. 14, 1996), Putnam App. No. 12-96-1, 1996 WL 481511, *1 (father-in-law was added to divorce action as a third-party defendant, based on allegations he had fraudulently taken possession of and concealed marital assets); Bensonv. Benson (June 29, 2001), Ashtabula App. No. 2000-A-0010, 2001 WL 733536, *1 (party claiming lien on cattle was added to the divorce action); and Perich-Varie v. Varie (Aug. 27, 1999), Trumbull App. No. 98-T-0029, 1999 WL 689741 (in-laws who claimed to own the marital premises were added to the divorce action as third-party defendants).
 {¶ 43} As a final point, we note that the record is not clear concerning whether the number of lots purchased was 11 or 13. The deed mentions 13 lots, but the testimony primarily refers to 11 lots. This issue should also be settled on remand.
 {¶ 44} Based on the preceding discussion, the fourth assignment of error is sustained in part. Remand will be for the limited purpose of deciding the correct number of lots purchased during the marriage, and re-valuing the remaining lots.
 V {¶ 45} The fifth assignment of error challenges the trial court's refusal to make Carole pay a portion of attorney fees incurred in resolving a lawsuit that arose in connection with the sale of the marina. According to the evidence, the same attorney represented both Vernon and Carole in Tennessee for an unspecified period of time, concerning the marina sale and a lawsuit that was apparently filed about the sale. At some point, Carole obtained her own attorney. Carole paid her own attorney fees and did not pay any money to the first attorney. Vernon claimed (without any supporting documentation), that his attorney fees were about $16,000, and that Carole paid her own attorney $4,000. Consequently, Vernon felt he was entitled to half the difference, or $6,000. The trial court refused to award any fees, stating that it lacked jurisdiction over the Tennessee lawsuit.
 {¶ 46} We think the trial court erred in focusing on the alleged lack of jurisdiction over the Tennessee lawsuit. If the attorney fees were a proper debt of the marriage, then the debt could have been equitably divided between the parties. See Easterling v. Easterling
(April 13, 2001), Montgomery App. No. 18523, 2001 WL 369734, *5-6. However, while the court's reason for refusing to allocate the attorney fee debt was wrong, the decision itself was correct.
 {¶ 47} Under R.C. 3105.171(A)(2), "during the marriage" normally means the date of marriage through the final hearing date. However, if use of such a date is inequitable, the court may select another date. In the past, dates that have been used include the date of permanent separation or de facto termination of the marriage. Minoughan v.Minoughan (June 23, 2000), Montgomery App. No. 18089, 2000 WL 799737, *3, citing Berish v. Berish (1982), 69 Ohio St.2d 318, 320-321. See also, Langer v. Langer (1997), 123 Ohio App.3d 348, 353-354.
 {¶ 48} At the conclusion of the final divorce hearing, Vernon's attorney specifically asked the court to use the separation date (August, 1998), as the date for the termination of the marriage. This was apparently by agreement of the parties, and the trial court specifically used the August, 1998 date in deciding the value of Vernon's military pension. Notably, Vernon did not present any evidence to indicate that any of the Tennessee attorney fees were incurred before the date of separation. Accordingly, the fees were not a "debt" incurred during the marriage and the court was not required to allocate a portion of the fees to each party.
 {¶ 49} We are required to affirm correct decisions, even if they are made for the wrong reasons. O'Herron v. Tomson, Montgomery App. No. 19111, 2002-Ohio-1796, ¶ 42, citing Joyce v. General Motors Corp. (1990), 49 Ohio St.3d 93. Consequently, the fifth assignment of error is without merit and is overruled.
 VI {¶ 50} In the sixth assignment of error, Vernon claims the trial court erred by overstating his retirement account, based on "an incomplete, speculative analysis, founded on unsound principles." We find no merit in this assignment of error.
 {¶ 51} At trial, Carole presented testimony from a certified public accountant who projected the present value of Vernon's military retirement. Vernon did not submit any expert testimony about the pension. Based on the expert testimony, the trial court found that the value of Vernon's pension as of August 31, 1998 (the date the parties separated), was $198,877.79. The court also found that the marital portion of the pension was 43%. As a result, the court awarded Carole 21.5%, or $42,758.72. This amount was then offset against Vernon's interest in Carole's 401(K) rollover.
 {¶ 52} Vernon's first criticism is that the expert (John Bosse) used a calculator on the witness stand. However, Bosse re-calculated some figures simply because the original information he received about the number of pension payments made during marriage was incorrect. Bosse added 14 payments to the total and then re-figured the present value of the pension. Vernon did not object to this at trial, nor did he dispute the figures that Bosse used. Accordingly, this objection was waived.Dunkle v. Dunkle (1999), 135 Ohio App.3d 669, 682. See also, Zachariahv. Rockwell Intern. (Apr. 29, 1998), Hardin App. No. 6-97-27, 1998 WL 212758, *4 (failure to object to the admissibility of an expert opinion waives the issue for appeal). We would add that we found nothing wrong with the re-calculation, since Bosse merely updated his conclusions using the same techniques he originally employed to figure the value of the pension.
 {¶ 53} Vernon's second criticism appears to be a general attack on factors used to calculate present value, such as assumptions about interest rates and life expectancy. Again, no objection was made at trial. Furthermore, such assumptions are routinely used to calculate present value. See, e.g., Watkins v. Cleveland Clinic Found. (1998),130 Ohio App.3d 262, 271, and Catron v. Catron (Dec. 19, 1997), Trumbull App. No. 96-T-5609, 1997 WL 799507, *2. As the court in Catron stressed, "[p]resent valuations are based on the best guesses that can be mustered on a variety of different factors including when a person will retire and when that person will die." Id. at 1997 WL 799507, *6. However, simply because valuation involves some "guesswork" (known in expert parlance as "assumptions"), that does not mean the results are untrustworthy. Some method has to be used to decide the current value of a future sum, and no evidence was offered to indicate that Bosse's choice of assumptions was incorrect.
 {¶ 54} Vernon's final criticism of Bosse's testimony is that it did not take Vernon's medical condition into account. According to Vernon, his qualification for disability pay should have triggered an evaluation of his medical condition. Therefore, because Bosse did not account for this, his opinion was speculative.
 {¶ 55} According to the evidence, Vernon's monthly military retirement of $1,304 included a VA waiver or disability component of $334. Bosse included this amount in his calculation of present value. On cross-examination, Bosse testified that no medical facts had been highlighted. He further said that if he had been given medical facts, he may have needed a medical opinion to interpret them. At this point, although Vernon's counsel was cross-examining, he did not supply any facts about Vernon's medical condition. If relevant facts existed that would affect Vernon's life expectancy, for example, they should have been brought to the expert's attention. However, no such information was mentioned. Moreover, after reviewing the record, we see no possible basis for such a claim. Specifically, Vernon received his "disability" award about a month after he retired from the military in 1978.
 {¶ 56} In light of the preceding discussion, the sixth assignment of error is overruled.
 VI {¶ 57} The seventh assignment of error contests the trial court's failure to award an offset of Carole's Social Security benefits. At the time of the hearings, Carole received about $830 per month in benefits. The trial court found that awarding an offset would be inequitable, because Carole's modest lifestyle would be dramatically reduced if her income stream were dismantled. Other points mentioned by the court were the benefit Vernon received due to Carole's financial foresight and his ensuing financial misconduct, Vernon's failure to introduce evidence of the present value of the Social Security, and Vernon's likely eligibility for one-half of Carole's Social Security benefits under Title 42, United States Code, Section 402.
 {¶ 58} We see no abuse of discretion in this decision. In Gerrardv. Gerrard (Mar. 13, 1990), Clark App. No. 2633, 1990 WL 27509, we noted that state courts have no ability to divide interests in Social Security benefits. 1990 WL 27509, *1. By the same token, these benefits may be considered when each party's needs and resources are evaluated for dividing marital property or awarding spousal support. Id.
 {¶ 59} In Gerrard, we found that the trial court did not err in failing to consider the Social Security benefits. We noted that the husband would, upon retirement, be entitled to receive a portion of Social Security benefits, and his ex-wife would also be entitled to some part pursuant to Title 42, United States Code, Section 402, as a divorced wife. Likewise, divorced husbands are parties to whom some benefit may be due under this statute. See Title 42, United States Code, Section 402(c).
 {¶ 60} In the present case, the trial court specifically mentioned this point when finding that no offset should be made for Carole's Social Security benefits. We agree with the trial court. We also agree with the court's other findings. In particular, we note that Vernon failed to present any evidence as to the present value of Carole's Social Security benefits. Therefore, even if the court wanted to make an offset, it was not given sufficient information to do so.
 {¶ 61} Accordingly, based on the above discussion, the seventh assignment of error is without merit and is overruled.
 VIII {¶ 62} In the eighth assignment of error, Vernon claims that the trial court erred by failing to award him sufficient compensation for certain home furnishings. The trial court awarded Carole all furnishings and property in the house in Ohio, and awarded Vernon all property and furnishing that had been located at the house in Tennessee. Also pertinent to this assignment of error is the court's finding, after dividing marital assets, that Vernon had a negative balance of $24,639.59. $20,000 of this amount was offset by Vernon's share of a joint bank account. The remaining $4,369.59 was offset against Vernon's interest in marital property from the Ohio residence. In this regard, the court also commented that Vernon had abandoned the personal property when he moved from the Ohio residence.
 {¶ 63} Vernon challenges these findings on several grounds. First, he claims that his estimate of the furnishings in the Ohio house was about $20,000. However, Carole disputed that amount. As we mentioned before, the trial court is in the best position to assess credibility.Jackson, 137 Ohio App.3d 782, 797. The trial court clearly did not believe Vernon's estimate.
 {¶ 64} Carole also testified that Vernon had already taken everything from the house that he wanted. Vernon's testimony did not contradict this account, as Vernon said that all he wanted from the Ohio house was a tablecloth his mother had made and a blanket that had belonged to his father. Unfortunately, Carole had thrown those items away. Vernon also had not given Carole any furnishings located in the Tennessee house.
 {¶ 65} In view of the above facts, we see no abuse of abuse of discretion in the award of personal property. The court's award may have even been a bit generous, since the two items of property Vernon wanted would not have been worth several thousand dollars — or at least there was no evidence to that effect. However, Carole has not claimed any error in this regard.
 {¶ 66} Vernon also contends that the finding about abandonment was incorrect, because a restraining order was in effect. However, the parties separated in August, 1998, and the restraining order was not issued until June, 1999. Carole additionally testified that Vernon had entered her home while she was away, by putting their grandson through a window. At that time, Vernon removed various items of personal property, including guns and a poker table. Consequently, Vernon had opportunity before the restraining order was in effect, and apparently took the opportunity at some point, to retrieve items he wanted. Like the trial court, we can only assume that he did not want the remaining property in the house. In any event, based on Vernon's own testimony, the few items of property he did not retrieve are no longer available. Consequently, we find no abuse of discretion by the trial court.
 {¶ 67} Accordingly, the eighth assignment of error is overruled.
 IX {¶ 68} In the ninth assignment of error, Vernon contests the trial court's decision on separate property that Vernon inherited from his aunt. In its decision, the court noted that Carole's inheritances of $92,858.49 were traceable, based on exhibits as well as Vernon's testimony. Consequently, the court awarded Carole this amount as separate property. Vernon also inherited money during the marriage, i.e., the record contains a final fiduciary account filed in August, 1998, that lists Vernon as one of several beneficiaries. According to the account, Vernon received $9,948.85. Vernon testified that this was from his aunt's estate, and that he deposited the money into his own account. Vernon thought it went into his account in Tennessee. He offered no documentation, including deposit slips or bank statements, that would allow the money to be traced. Based on this testimony, the court awarded Vernon all the remaining traceable funds he inherited from his aunt.
 {¶ 69} As we mentioned, we review property awards for abuse of discretion. Jackson, 137 Ohio App.3d 782, 802, and Okos v. Okos
(2000), 137 Ohio App.3d 563, 570.
 {¶ 70} Inheritances during marriage are admittedly separate property. Peck v. Peck, (1994), 96 Ohio App.3d 731, 734; R.C.3105.171(A)(6)(a)(i). However, that fact is not controlling, because "the party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property." Id.
 {¶ 71} In the present case, Vernon's inheritance was unquestionably separate property, but he did not give the trial court enough information to trace the asset after its receipt. Carole had no access to the Tennessee bank accounts after the date of separation, and Vernon did not provide any documentation indicating that she had used any of the inheritance or that the funds were placed in an account to which she had access. Presumably, such documentation was available, since banks do keep records. Tracing where the money went would also not have been difficult, as the amount was fairly large. Because Vernon failed to provide such evidence, the trial court did not abuse its discretion by awarding Vernon all the remaining traceable money he inherited from his aunt.
 {¶ 72} Based on the preceding discussion, the ninth assignment of error is overruled.
 X {¶ 73} The final assignment of error contests the trial court's failure to award Vernon a distributive share of an IRA that Carole owned. According to Vernon, both parties purchased IRAs in the 1970's by placing $2,000 in two accounts, for total contributions of $4,000 each. Vernon believes he is entitled to an offset for the pre-existing IRA account. Carole points out that her pre-existing IRA no longer exists as a separate asset, as it was transferred into her retirement fund when she retired from the telephone company. Thus, since the trial court awarded Vernon an equitable share of this account, nothing more should be awarded.
 {¶ 74} We agree with Carole. Vernon testified that the parties each put $2,000 in an IRA in the years 1971 and 1972. Vernon also said that when Carole retired in 1992, her $4,000 was transferred into her retirement fund, while he kept his IRA money in an American Funds account (later valued at $35,000). In the decision, the trial court relied on an exhibit submitted by Vernon, and found the combined value of Carole's 401(K) funds to be $234,037. This amount was the sum of two IRA accounts shown on the exhibit. One account was Carole's work retirement fund from 1992, into which the pre-existing $4,000 IRA was rolled.
 {¶ 75} The trial court awarded Vernon 44% of Carole's retirement funds, or $90,619.13. This amount was then offset against Vernon's $35,000 retirement fund, Carole's share of Vernon's military pension, Carole's interest in the three lots in Tennessee, and Carole's interest in the Tennessee lot that was sold for $30,000-$33,000. As we indicated above, the net offset was a negative amount, and this was then offset against Vernon's share of a joint savings account and the personal property in the Ohio residence.
 {¶ 76} Consistent with established principles, the trial court attempted to preserve each party's pension or retirement assets, while disentangling their economic partnership. Hoyt v. Hoyt (1990),53 Ohio St.3d 177, paragraph two of the syllabus. See also, James v.James (1995), 101 Ohio App.3d 668, 685.
 {¶ 77} Because the trial court properly took the pre-existing $4,000 IRA into account when distributing the marital assets, the tenth assignment of error is without merit and is overruled.
 {¶ 78} In light of the above discussion, assignments of error one through three, and five through ten are overruled. The fourth assignment of error is sustained in part. Accordingly, the case will be affirmed in part, reversed in part, and remanded for the limited purpose of re-valuing the remaining lots in Tennessee and deciding the correct number of lots purchased during the parties' marriage.
GRADY, J., and YOUNG, J., concur.